❏ Original  ❏

CLERK'S OFFICE
A TRUE COPY
Feb 08, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information about the location of the cellular device assigned phone number (414) 399-7825 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 23-M-523 2nd Ext.

Matter No. 2023R00438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___2-22-24___ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Hon. Stephen Dries___ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for __30__ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: ___2-8-24 9:35 am___

*Judge's signature*

City and state: ___Milwaukee, WI___

Honorable Stephen Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.:<br>23-M-523 2nd Ext. | Date and time warrant executed:<br>2/8/24 @ 9:35 AM | Copy of warrant and inventory left with:<br>N/A |
| Inventory made in the presence of :<br>N/A | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

Phone record data

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 4/29/24

_____
*Executing officer's signature*

TFO Richard KLARKOWSKI
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned number for 414-399-7825 (Target Cellular Device),  (referred to herein and in Attachment B as "the Target Cellular Device"), with listed subscriber(s) Victoriano Botello Jr., that is in the custody or control of  T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

2. The Target Cellular Device.

1

## ATTACHMENT B

### Particular Things to Be Seized

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cellular Device for the time period May 1, 2022, to present:

    i. Names (including subscriber names, user names, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long-distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

2

viii. All subscriber and extended subscriber information, handset identifiers, handset make and model, WI-FI MAC address, and account notes and memos pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c).

ix. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

x. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cellular Device, including:

(A) Call detail records and data reports with cell site location information for voice, SMS, MMS, and data connections, originating and destination IP addresses, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past thirty (30) days pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the Target Cellular Device for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cellular Device will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, for such information associated with the Target Cellular Device.

c. Information about the location of the Target Cellular Device for a period of 30 days, during all times of day and night. "Information about the location of the

3

Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cellular Device on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. Information about the target cellular device and its location, later referred to collectively as location information, includes all precision location information, E-911 Phase II data, GPS data, latitude-longitude data, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent), and real time cell site information for 30 days beginning from the date the warrant was issued. This includes initiating a signal to determine the location of the Target Cellular Device on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The information includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the furnishing of information, facilities, technical assistance, and the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. §§ 3123-3124 by the service provider and the Federal Bureau of Investigation. Because the request for such location data may include use of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41. The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes

4

all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

    iii. This pen register / trap and trace device shall be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

d. The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance. Any service provider or representative who gains access to the information in this warrant shall not disclose the existence of the warrant, order, or investigation to any third party unless ordered to do so by the Court. Additionally, the agency requests that all court orders and supporting documents, including the affidavit and search warrant, be sealed until further order by the Court.

e. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

5



CLERK'S OFFICE
A TRUE COPY
Feb 08, 2024
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**Information about the location of the cellular<br>device assigned phone number (414) 399-7825** | )<br>)<br>)<br>)<br>)<br>) | Case No. 23-M-523 2nd Ext.<br><br>Matter No. 2023R00438 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A.**

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; &<br>843(b) | Distribution and possession with the intent to distribute controlled substances;<br>Conspiracy to possess with the intent to distribute controlled substances; and<br>unlawful use of a communication facility. |

The application is based on these facts:

**See Attached Affidavit.**

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Richard Klarkowski, FBI TFO
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: __2-8-24__

_____
*Judge's signature*

City and state: __Milwaukee, WI__

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Richard Klarkowski, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

1.      I make this affidavit in support of an application for an additional extension of a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 414-399-7825, (the "Target Cellular Device"), whose service provider is T-Mobile. ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ, 07054. The Target Cellular Device is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cellular Device.

3.      I am employed with the Milwaukee Police Department as a full time sworn police officer for approximately 11 years.  I am currently assigned as a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) Milwaukee Area Safe Streets Task Force (MASSTF).  I

1

have investigated violations of Federal law, directed drug investigations, obtained, and executed search and arrest warrants related to the distribution of illegal narcotics and illegal firearm possession, and debriefed confidential informants and cooperating defendants. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests. I have experience in the investigation, apprehension and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4.      The facts in this affidavit come from my personal observations, training, experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 United States Code §§ 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility) have been committed, are being committed, and may be committed by Victoriano BOTELLO, Jr. ("V. Botello"). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

2

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7. In March 2021, the Milwaukee Police Department received information from an anonymous tip that Cain Botello Jr. ("Botello Jr.") was selling marijuana and pills. The anonymous tip stated that Botello Jr. was storing drugs and guns at the address of 1118 S. 35th Street, which is a residence belonging to his father, Cain Botello Sr. ("Botello Sr."), and his uncle, Victoriano Botello Jr. ("V. Botello"), as well as the address of 1510 S. 36th Street, which belonged to the mother of Botello Jr.'s child (Perla Y. Perez-Jimenez). The anonymous tip stated that Botello Jr. had a Dodge Charger Hellcat edition that he reported stolen, but the anonymous tipster believes Botello Jr. committed insurance fraud. The anonymous tipster stated that Botello Jr. used the money claimed from insurance, as well as money from his drug proceeds, to fund his clothing line company called "Turn Around Gang" clothing. MASSTF was able to identify the address of 285 N. Janacek Road (Brookfield, WI 53045) as the warehouse where Botello Jr. was making his clothing. This building is also being used by two other businesses owned by Botello Jr. (Midwest Vinyl and Midwest Detailing). Botello Jr. also sells his clothing at a store located in downtown Milwaukee located at 719 N. Milwaukee Street.

**Debrief of CHS #1**

8. In late May 2022, MASSTF conducted a debrief of a confidential human source, hereafter referred to as CHS #1. CHS #1 stated that CHS #1 knew of subjects identified as Cain M. Botello Sr.

3

and Victoriano Botello Jr. who are cocaine traffickers in the Greater Milwaukee area. CHS #1 stated that Botello Sr. is a large-scale narcotics trafficker who has access to kilograms of cocaine. CHS #1 stated that Botello Sr. and his brother (Victoriano Botello Jr.) are both members/associates of the Latin Kings street gang. CHS #1 stated that Botello Sr. and V. Botello were the subjects of a long-term drug investigation by the Drug Enforcement Administration (D.E.A.) for dealing kilograms of cocaine. CHS #1 stated that Botello Sr. and V. Botello frequent bars on the south side of Milwaukee (particularly Club Sixth Street – 2101 S. 6th Street and El Infierno Bar – 2000 W. Mitchell Street) where they would deal cocaine. CHS #1 stated that Botello Sr. had a son named Cain M. Botello Jr. CHS #1 stated that Botello Sr. would supply Botello Jr. with cocaine. This information is based personal conversations CHS#1 had with Botello Sr.

9.   Case agents believe CHS #1 is reliable and credible. Since May 2022, CHS #1 has provided information to law enforcement concerning criminal activity in the Milwaukee area. CHS #1's information has been accurate and corroborated, in part, by my knowledge of violent gang members in the Milwaukee area, as well as intelligence gathered from other Milwaukee gang investigations. This intelligence included consensually recorded phone calls, surveillance, and information from other confidential sources. CHS #1 is cooperating with law enforcement for consideration regarding a federal investigation involving narcotics trafficking. CHS #1 is a convicted felon with prior convictions for Theft, Criminal Damage to Property, Criminal Trespass, Armed Robbery, Recklessly Endangering Safety and Carrying Concealed Weapon. For these reasons, case agents believe CHS #1 to be reliable.

**Debrief of CHS #2**

4

10.     I am currently working with a Confidential Human Source (CHS #2), who I believe is reliable and credible. Since July 2022, CHS #2 has provided information to law enforcement officers concerning criminal activity in the Milwaukee, WI area.  Information provided by CHS #2 has been accurate and corroborated, in part, by: (a) my knowledge of violent gang members in the Milwaukee, WI area; (b) intelligence gathered from other Milwaukee gang investigations through controlled narcotics purchases and consensually recorded phone calls; (c) independent investigation including surveillance; and (d) information from other confidential sources. CHS #2 is cooperating with case agents for monetary compensation. CHS #2 is a convicted felon with prior convictions for Burglary, Operating a Motor Vehicle Without Owner's Consent, Battery, and Possession with Intent to Deliver Narcotics. CHS #2 has conducted more than one controlled buy of cocaine on behalf of case agents. After one controlled buy (not the buy detailed below), TFO Andrew Langer met with CHS #2 and the CHS #2 made statements about what occurred during the buy.  TFO Langer and I then reviewed audio/video footage made by CHS #2 of the transaction and found that it was consistent with statements from CHS #2.  For these reasons, I believe CHS #2 is credible and reliable.

### CHS #3

11.     I am currently working with a Confidential Human Source (CHS #3), who I believe is reliable and credible. CHS#3 has been cooperating with the Federal Bureau of Investigations since approximately August of 2023. CHS#3 is cooperating for consideration in a pending federal felony narcotics case. CHS#3 is a convicted felon with prior arrests for armed robbery and possession with intent to distribute marijuana. CHS#3 has provided information on drug and gun traffickers operating within Milwaukee. That information has been independently corroborated by law enforcement. CHS#3 has participated in controlled drug buys on behalf of case agents and provided information

5

that directly led to the arrest and indictment of at least one individual. CHS#3's information has also directly led to the recovery of firearms and narcotics that CHS#3 had indicated would be found at specific locations. CHS#3 has debriefed with case agents and possesses firsthand knowledge of the Botello DTO. For these reasons, I believe CHS #3 is credible and reliable.

**CONTROLLED BUY OF COCAINE**

12. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CHS, purchases drugs or firearms from a target at the direction of law enforcement. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CHS is used, s/he is searched for contraband, weapons, and money before the operation. The CHS is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the CHS meets case agents at a pre-determined meet location and gives the purchased drugs or firearms and the recording/monitoring equipment to the case agents. The CHS is again searched for contraband, weapons and money then interviewed by the case agents about the drug or firearms transaction. A sample of the suspected drugs is then field tested by the case agents for the presumptive presence of controlled substances and then placed on inventory pursuant to normal inventory procedures. All the calls to the target by the CHS are consensually recorded calls under the direction and control of case agents and made in the presence of case agents.

13. In early December 2023, TFO Andrew Langer met with CHS #2 regarding a controlled buy of cocaine from Roberto Aviles-Rogel (W/M, 04/13/1976) aka "Negro." CHS #2 was going to attempt to purchase a quantity of cocaine from Aviles-Rogel. CHS #2 communicated with Aviles-Rogel via telephone at the phone number of (847) 641-6044, which was witnessed by a Milwaukee

6

Police Department (MPD) undercover officer ("undercover officer"). While in phone contact with the user of (847) 641-6044, CHS #2 arranged for CHS #2 and the undercover officer to meet with Aviles-Rogel to conduct the cocaine purchase using an FBI undercover vehicle. The purpose of the controlled buy was to confirm that Botello Sr., Botello Jr., and/or Botello family members were Aviles-Rogel's cocaine suppliers.

14. The undercover officer conducting the controlled buy with CHS #2 conducted an initial search of CHS #2 and did not discover any contraband, money, or weapons. Case agents kept the undercover officer and CHS #2 under constant visual surveillance from that time that CHS #2 left the pre-determined location until they reached the location within the Eastern District of Wisconsin where CHS #2 and the undercover officer were to meet with Aviles-Rogel. CHS #2 made no stops and interacted with no one.

15. In the presence of the undercover officer, CHS #2 received a phone call from Aviles-Rogel at (847) 641-6044 to discuss the purchase of cocaine. Case agents on surveillance were positioned around Aviles-Rogel's residence located at 2218 S. 21st Street, Milwaukee, Wisconsin.

16. While on surveillance, case agents observed Aviles-Rogel exit his residence and enter the driver seat of a black Chevrolet Silverado (WI UF3579) and leave the area southbound on S. 21st Street.

17. Case agents conducted mobile surveillance of Aviles-Rogel in the black Silverado until he arrived at El Infierno Bar, located at 2000 W. Mitchell Street. While parked outside the bar, case agents observed Aviles-Rogel meet with an unknown individual. After a brief interaction, case agents observed Aviles-Rogel leave the location in the black Silverado.

18. Case agents conducted mobile surveillance of Aviles-Rogel until he reached the pre-

determined meet location (located within Milwaukee County). Case agents already on surveillance at the pre-determined meet location observed CHS #2 enter the front passenger seat of the black Silverado operated by Aviles-Rogel. Case agents then observed CHS #2 exit the black Silverado and return to the undercover vehicle where the undercover officer was located. According to the undercover officer, the CHS stated that the CHS provided the buy money to "Negro" while inside the black Silverado. Case agents and the undercover officer observed that Aviles-Rogel was the sole occupant of the black Silverado at the time that CHS #2 was inside the vehicle.

19. Case agents followed Aviles-Rogel in the black Silverado from the meet location and briefly lost sight of his vehicle. A short time later, case agents observed Aviles-Rogel park the black Silverado at the El Infierno Bar. Aviles-Rogel exited the black Silverado and entered the bar.

20. I later reviewed pole camera footage that depicted the exterior of Cain Botello Sr.'s residence, located at 921 W. Walker Street, Milwaukee, Wisconsin. I observed Victoriano Botello Jr. arrive at the residence and enter the front door during the timeframe just prior to this controlled buy. I was able to observe that V. Botello was not carrying anything in his hands when he entered Botello Sr.'s residence. I am aware that Botello Sr. was not in the residence on the date of the controlled buy.

21. On the pole camera footage, I later observed V. Botello exit the residence approximately 11 minutes later, carrying a white plastic shopping bag in his right hand. Case agents on surveillance outside of El Infierno Bar observed V. Botello arrive operating his black GMC Yukon (WI ASL-3439) wearing the same clothing as depicted on the pole camera footage. Case agents observed V. Botello enter the front door of the bar carrying what appeared to be the same white plastic shopping bag. Based on prior surveillance, case agents were aware that Aviles-Rogel was inside of the bar at the time that V. Botello entered with the white plastic bag.

8

22.     Shortly thereafter, case agents observed V. Botello exit the bar with no bag in his hands. Within minutes of V. Botello exiting/leaving the bar, case agents observed Aviles-Rogel exit the bar and appeared to be clutching something underneath or inside of his hooded sweatshirt.  Case agents observed Aviles-Rogel re-enter the black Silverado and drive away.

23.     Surveillance attempted to follow Aviles-Rogel back to the pre-determined meet location where Aviles-Rogel was supposed to meet with the undercover officer and CHS #2. Case agents briefly lost visual of Aviles-Rogel's vehicle, but quickly regained surveillance.  Case agents then observed Aviles-Rogel parking the black Silverado next to the undercover vehicle operated by the undercover officer and CHS #2.  From the time that CHS #2 left Aviles-Rogel's black Silverado until the time that Aviles-Rogel returned to the meet location, CHS #2 was in the presence of the undercover officer and did not meet with anyone else.

24.     Case agents then observed CHS #2 exit the undercover vehicle and enter the front passenger seat of the black Silverado operated by Aviles-Rogel.  Case agents observed CHS #2 remain inside the black Silverado for a short time and then return to the undercover vehicle operated by the undercover officer.  The undercover officer advised me that once inside the undercover vehicle, CHS #2 provided the undercover with a quantity of cocaine inside of a white plastic bag.  I later viewed this bag, and it is consistent with the bag I observed V. Botello obtain from Botello Sr.'s residence on the pole camera video and carry into the bar.

25.     The undercover officer conducted a final search of CHS #2 and did not discover any contraband, money, or weapons.  Case agents kept CHS #2 under constant visual surveillance from the time that CHS #2 left the undercover vehicle until CHS #2 returned to the undercover vehicle. CHS #2 made no stops and interacted with no one other than the occupant of the black Silverado.

9

Case agents and the undercover officer observed that Aviles-Rogel was the sole occupant of the black Silverado at the time that CHS #2 was inside the vehicle.

26. FBI Special Agent David Shamsi transported the suspected cocaine to the FBI Milwaukee Field Office for testing. While at the FBI, TFO Larrel Lirette later subjected a sample of the suspected cocaine to a TruNark presumptive field test, which yielded positive results for cocaine HCl. The weight of the cocaine is consistent with an amount intended for resale and not for personal use based upon my training and experience in drug investigations.

27. The undercover officer and TFO Langer debriefed CHS #2 concerning the purchase of cocaine. CHS #2 advised that after getting into the black Silverado, CHS #2 acquired the cocaine from "Negro" (known to case agents to be Aviles-Rogel). The recording equipment CHS #2 possessed at the time of this transaction did not function properly, so case agents were unable to review it to corroborate what CHS #2 stated. However, the undercover officer was located nearby and observed CHS #2 exit the undercover vehicle, walk directly to the black Silverado that case agents observed Aviles-Rogel to be operating moments earlier, and then walk directly back to the undercover vehicle in possession of the cocaine.

28. After V. Botello and Aviles-Rogel left the bar, I observed pole camera video of V. Botello arriving back at Botello Sr.'s residence approximately 10 minutes later and remaining inside for about five minutes.

29. Based on my training and experience, along with the observations made during this operation, I believe that Victoriano Botello retrieved the cocaine from Botello Sr.'s residence, transported it in the white plastic bag to the bar, where he met with Aviles-Rogel. I believe that V. Botello provided the cocaine to Aviles-Rogel in the white plastic bag in exchange for the buy money

10

that CHS #2 had provided to Aviles-Rogel moments earlier. I believe that V. Botello then delivered the buy money to Botello Sr.'s residence and Aviles-Rogel met with the CHS #2 to provide the cocaine that Aviles-Rogel just acquired from V. Botello. Case agents previously secured a court order for location information for Botello Sr.'s cellular telephone number of 414-366-6544. I know based on that location data for Botello Sr.'s cellphone that Botello Sr.'s phone was in Mexico at the time of the controlled buy. I believe V. Botello was operating day to day operations on behalf of Botello Sr. while he was in Mexico.

30.     Information obtained from this search warrant will be used to attempt to locate V. Botello and his frequented locations to identify narcotics and proceed stash locations. Furthermore, the information obtained from this warrant will be utilized to monitor who V. Botello contacts to identify his drug distribution network and source(s) of supply.

## PHONE TOLL ANALYSIS

31.     While conducting toll analysis of 414-366-6544, a phone number registered to Cain Botello Sr., I located phone number **414-399-7825 ("Target Cellular Device")** in contact with Botello Sr.'s number. A query of a law enforcement database revealed that the phone number was registered to Victoriano Botello Jr. I have personally used this database over 25 times in the past for the purpose of identifying the registered user of a specific phone number and have found that it is accurate and reliable.

32.     I then administratively subpoenaed records for 414-399-7825 (Target Cellular Device) and learned that the service provider for telephone number 414-399-7825 is T-Mobile. The listed subscriber for 414-399-7825 is Victoriano Botello Jr. I am aware from prior investigations that T-Mobile is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

11

33.     I am also aware that another Botello DTO member, Marco Medel ("Medel") was in contact with V. Botello and Aviles-Rogel's phones during the December controlled buy detailed above.  Medel is a street level cocaine trafficker selling narcotics on behalf of the Botello DTO. Case agents later reviewed court ordered phone records for Aviles-Rogel's phone and V. Botello's phone (Target Cellular Device).  Upon reviewing records from Aviles-Rogel's phone, case agents observed that Aviles-Rogel's phone was in contact with phone number 414-499-6919 fairly regularly. Utilizing law enforcement databases, TFO Langer learned this number belonged to Medel. An administrative subpoena served for 414-499-6919 revealed that Marco Medel is the listed subscriber. Case agents have observed Medel at El Infierno Bar on multiple occasions over the last several months. TFO Langer reviewed phone records for Aviles-Rogel, V. Botello, and Medel's phones for the date of the above-described controlled buy.  Said records showed that CHS#2 contacted Aviles-Rogel's phone number 847-641-6044. Aviles-Rogel's number called CHS#2 back (ostensibly to discuss the drug transaction). Within 30 minutes of the call between CHS#2 and Aviles-Rogel's phone, Aviles-Rogel's phone called Medel's phone number of 414-499-6919. Within 5 minutes after the last call between Aviles-Rogel and Medel's phones, Medel's phone called Victoriano Botello's phone at 414-399-7825 (Target Cellular Device).  Shortly thereafter, as detailed above, Aviles-Rogel met with CHS#2 and CHS#2 provided Aviles-Rogel with the buy money.  Aviles-Rogel did not yet have the cocaine. Minutes later, Medel's phone number called Aviles-Rogel's phone number twice and Medel was observed by case agents at El Infierno Bar. V. Botello was observed arriving at the bar, and Aviles-Rogel was later observed exiting the bar, and ultimately met with CHS#2 to deliver the cocaine as detailed above. Case agents believe that Aviles-Rogel contacted Medel to obtain the cocaine ordered by CHS #2, then Medel immediately contacted Victoriano Botello, who acquired the cocaine from

12

Botello Sr.'s residence.

34. On Wednesday, January 17, 2024, TFO Eulia Boyd was monitoring pole camera activity at the address of 921 W. Walker Street, the address associated with Cain Botello Sr. TFO David Cabral was monitoring pen register/trap and trace data for V. Botello's phone (Target Cellular Device). At approximately 12:38pm, Marco Medel's phone and V. Botello's phone (Target Cellular Device) were in contact with each other via telephone. I reviewed precision phone location data for Cain Botello Sr.'s phone, which showed that this phone was pinging in the general area of his residence at the time V. Botello arrived. From that, I believe that it is likely that Botello Sr. was present within the residence when V. Botello arrived.

35. On the pole camera, TFO Boyd observed that: at approximately 1:49pm, V. Botello arrived at Botello Sr.'s residence (921 W. Walker Street) in his black GMC Yukon, and entered the residence using the front door. At approximately 1:56pm, V. Botello exited Botello Sr.'s residence and entered the front driver seat of his GMC Yukon. It appeared that V. Botello had an unknown weighted object in the right pocket of his jacket. Based on my training and experience in drug investigations, I suspect that V. Botello retrieved a quantity of suspected cocaine from Botello Sr.'s residence in response to the phone contact from Medel (consistent with what occurred during the Controlled Buy detailed above).

36. TFO Boyd also viewed pole camera footage showing the exterior of El Infierno Bar for January 17, 2024, which showed that: at approximately 1:46pm, a male matching the description of Marco Medel arrived at El Infierno Bar. At approximately 2:05pm, V. Botello walked into the front door of El Infierno Bar carrying an unknown squared object in his left hand. At approximately 2:54pm,

13

V. Botello left El Infierno Bar. V. Botello did not appear to have the unknown squared object in his hand when he left the bar.

37. V. Botello's actions on January 17, 2024, and the pattern of phone contacts between V. Botello's phone (Target Cellular Device) and Medel's phone, were consistent with those described during the Controlled Buy detailed above, where V. Botello's phone received a phone call from Medel's phone, V. Botello then traveled to Botello Sr.'s residence, retrieved a quantity of cocaine, drove to El Infierno Bar where Medel was located and where the cocaine was ultimately supplied to Aviles-Rogel. Based on this and the overall investigation, I believe V. Botello delivered cocaine to Medel inside El Infierno Bar on January 17, 2024 and that V. Botello retrieved that cocaine from Botello Sr.'s residence.

## CHS#3'S OBSERVATIONS

38. In the weeks following the above-described controlled buy involving Aviles-Rogel, Medel, and V. Botello, case agents instructed CHS#3 to enter the El Infierno Bar with the intent that CHS#3 would become known to various patrons and eventually be able to purchase cocaine from Botello DTO members. CHS#3 was shown pictures of individuals previously observed at the bar by investigators to include V. Botello and Medel. CHS#3 was tasked with making observations and attempting to obtain Medel and/or V. Botello's phone number.

39. Over the course of at least 5 trips to the bar between November and December 2023, CHS#3 observed Medel and V. Botello in the El Infierno Bar on more than one occasion. CHS#3 stated that Medel showed CHS#3 approximately 7 grams of cocaine that Medel has in his pocket. Based on CHS#3's known prior history, I am confident that CHS#3 knows what cocaine looks like

14

and is able to reliably identify it based on its appearance.  CHS#3 stated that CHS#3 and Medel discussed drug transactions, but Medel was cautious and told CHS#3 that he would not give out his phone number until he knew CHS#3 better. CHS#3 also reported that Medel and V. Botello were clearly working together and that V. Botello would occasionally summon Medel to a concealed basement area within the bar. CHS#3 does not know what is in the basement or what discussions were had while V. Botello and Medel were down there. At this time, CHS#3 has been unsuccessful in obtaining Medel's phone number. Medel told CHS#3 that he could not give his number to CHS#3 unless V. Botello approves.

### Prior Court Authorized Electronic Surveillance

40.     On December 13, 2023, the Honorable Judge Stephen C. Dries authorized a warrant for electronic surveillance for 414-399-7825 (Target Cellular Device), which was served on T-Mobile. On January 12, 2024, the Honorable Judge Stephen C. Dries authorized an extension of that warrant for electronic surveillance for 414-399-7825 (Target Cellular Device), which was also served on T-Mobile.  I am now seeking a second extension of this order.  Case agents' review of the court authorized electronic surveillance data and call detail records, in conjunction with physical surveillance, and other aspects of my investigation are all consistent with the Botello DTO's ongoing involvement with drug trafficking and V. Botello's involvement with the Botello DTO.

41.     Since this order was granted, case agents have been monitoring 414-399-7825 (Target Cellular Device).  While monitoring this cellular phone data, case agents were able to: (1) determine potential locations frequented by Victoriano Botello based on the general location of the ping data from his phone; (2) focus physical surveillance efforts on those locations; and (3) preserve location data for Victoriano Botello for future reference and evidence. I believe that the extension of the

15

existing order will further this investigation. The location data associated with the Target Cellular Device will assist case agents in conducting targeted physical surveillance and further identifying the locations and individuals associated with and the nature and scope of V. Botello's drug trafficking activities. For example, case agents believe that it will be valuable to their investigation to have ongoing precision phone location information for V. Botello's phone (Target Cellular Device) because it will help case agents determine when V. Botello is present at El Infierno Bar so case agents can better deploy CHS#3 to travel to the bar and attempt contact with V. Botello or so case agents can conduct physical surveillance of the bar when V. Botello is present to see if he meets with other Botello DTO members.

42. I reviewed records produced pursuant to the orders of the Honorable Judge William E. Duffin for 414-460-5121, 414-366-6544, and 414-544-5424 (numbers associated with Cain Botello Sr. and Cain Botello Jr.) and noted:

    a. 414-460-5121 (Botello Jr.) and 414-366-6544 (Botello Sr.) were in contact 0 times since November 29, 2023;

    b. 414-544-5424 (Botello Jr.) and 414-366-6544 (Botello Sr.) were in contact 577 times since November 29, 2023;

    c. 414-544-5424 (Botello Jr.) and 414-399-7825 (**V. Botello/Target Cellular Device**) were in contact over 252 times since November 29, 2023;

    d. 414-460-5121 (Botello Jr.) and 414-399-7825 (**V. Botello/Target Cellular Device**) were in contact 0 times since November 29, 2023; and

    e. 414-366-6544 (Botello Sr.) and 414-399-7825 (**V. Botello/Target Cellular Device**) were in contact 152 times since November 29, 2023;

43. I reviewed records for 414-399-7825 (V. Botello/Target Cellular Device) produced pursuant to the Honorable Judge Stephen Dries' January 12, 2024 order and noted that 414-399-7825

16

(V. Botello/Target Cellular Device) was most recently in contact with 414-366-6544 (Botello Sr.) on February 3, 2024 and that 414-399-7825 (V. Botello/Target Cellular Device) was most recently in contact with 414-544-5424 (Botello Jr.) on February 4, 2024.

44. I reviewed records for 414-399-7825 (V. Botello/Target Cellular Device) produced pursuant to the Honorable Judge Stephen Dries' December 13, 2023 and January 12, 2024 orders and noted that 414-399-7825 (V. Botello/Target Cellular Device) was in contact with 414-499-6919 (Medel) 54 times since December 13, 2023, and most recently on February 5, 2024.

45. I believe the extension of the existing order for 414-399-7825 (Target Cellular Device) will further the investigation into the Botello DTO. During the December Controlled Buy, it became clear to case agents that V. Botello acquired the cocaine later distributed to CHS#2 by Rogel-Aviles from Cain Botello Sr.'s residence on W. Walker Street. Case agents learned that Botello Sr. returned to the United States on or about December 20, 2023. Case agents also believe that V. Botello acquired additional cocaine from the W. Walker Street residence on January 17, 2024 based on the pole camera footage and pattern of calls between Medel's phone and V. Botello's phone. Case agents believe that further monitoring of the device associated with V. Botello will document the frequency of his travel to the W. Walker Street residence, his interaction with Botello Sr., Botello Jr., Medel, and the El Infierno Bar and may identify additional "stash" locations and DTO members.

46. Evidence obtained during this investigation leads case agents to believe that V. Botello operates the Target Cellular Device. I conducted a cell phone provider check and the service provider for the Target Cellular Device is T-Mobile.

47. Case agents are requesting this warrant authorizing a collection of data related to the Target Cellular Device for an additional 30 days to further investigate V. Botello's activities, and to

17

identify locations to which V. Botello is traveling to further his drug distribution trafficking activities.

48.    Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that V. Botello is engaged in the trafficking and distribution of controlled substances and is using the target cellular device while engaged in these crimes.  I further submit that probable cause exists to believe that obtaining the location information of the target cellular device will assist case agents in determining V. Botello's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

49.    In my training and experience, I have learned that T-Mobile ("Service Provider") is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

18

50.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the target cellular device. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; and (4) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

51.     I further know that some service providers can collect timing advance or engineering data commonly referred to as, RTT, Timing Advance, LOCDBOR, or equivalent. This engineering data provides a distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate geographic area that is more precise than cell-site data alone.

### E-911 Phase II / GPS Location Data

52.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

19

connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the target cellular device, including by initiating a signal to determine the location of the target cellular device on the Service Provider's network or with such other reference points as may be reasonably available.

### Subscriber Information

53. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the target cellular device's user or users and may assist in the identification of co-conspirators.

### <u>AUTHORIZATION REQUEST & MANNER OF EXECUTION</u>

54. I request that the Court issue the proposed search warrant pursuant to Federal Rule of

20

Criminal Procedure 41 and 18 U.S.C. §§ 2703(c) and 2711.

55. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), this application and the accompanying warrant are intended to comply with requirements set forth in 18 U.S.C. §§ 3122-3123.

56. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

57. In my training and experience, I have learned that T-Mobile is a company with its headquarters located within the United States and provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of cellular devices to which they provide service. That information includes (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, (2) cell-site data, also known as "tower/face information" or cell tower/sector records, and (3) timing advance or engineering data commonly referred to as per call measurement data (RTT, True Call, LDBoR, or equivalent). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to

21

which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

58. To facilitate execution of this warrant, law enforcement may use an investigative device or devices (sometimes referred to as a Cell Site Simulator or Wi-Fi geolocation device) capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

59. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law

22

enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

60. I request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the target cellular device would seriously jeopardize the ongoing investigation. Such disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is a reasonable necessity for the use of the techniques described. See 18 U.S.C. § 3103a(b)(2). As further specified in the attachment, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is a reasonable necessity for that seizure. See 18 U.S.C. § 3103a(b)(2).

61. I further request the following information from the service provider: the installation and use of a pen register trap and trace device, all real-time precision location information, including E-911 Phase II data, GPS data, and latitude-longitude data, real time cell site information, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) beginning 30 days from the date the warrant is issued.

62. I further request call detail records and data reports (voice, SMS, MMS), including cell

23

site location information, originating and destination IP addresses, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past 30 days.

63. I further request subscriber and extended subscriber information, handset identifiers, handset make and model, Wi-Fi MAC address, and account notes and memos for the target device.

64. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the target cellular device outside of daytime hours.

65. I further request that the pen register / trap and trace device be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

66. I further request that the Court order all documents in support of this application, including the affidavit and search warrant, be sealed until further order by the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. I further request that the Court order any service provider, or their representatives, not to disclose the existence of this warrant or investigation unless ordered to do so by the Court.

67. A search warrant may not be legally necessary to authorize all of the investigative techniques described. Nevertheless, I submit this warrant application out of an abundance of caution.

24

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned number for 414-399-7825 (Target Cellular Device),  (referred to herein and in Attachment B as "the Target Cellular Device"), with listed subscriber(s) Victoriano Botello Jr., that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

2. The Target Cellular Device.

25

## ATTACHMENT B

### Particular Things to Be Seized

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cellular Device for the time period May 1, 2022, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

26

viii. All subscriber and extended subscriber information, handset identifiers, handset make and model, WI-FI MAC address, and account notes and memos pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c).

ix. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

x. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cellular Device, including:

(A) Call detail records and data reports with cell site location information for voice, SMS, MMS, and data connections, originating and destination IP addresses, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past thirty (30) days pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the Target Cellular Device for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cellular Device will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, for such information associated with the Target Cellular Device.

c. Information about the location of the Target Cellular Device for a period of 30 days, during all times of day and night. "Information about the location of the Subject

27

Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cellular Device on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.  Information about the target cellular device and its location, later referred to collectively as location information, includes all precision location information, E-911 Phase II data, GPS data, latitude-longitude data, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent), and real time cell site information for 30 days beginning from the date the warrant was issued. This includes initiating a signal to determine the location of the Target Cellular Device on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The information includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the furnishing of information, facilities, technical assistance, and the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. §§ 3123-3124 by the service provider and the Federal Bureau of Investigation. Because the request for such location data may include use of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41. The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

28

iii.  This pen register / trap and trace device shall be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

d.  The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance. Any service provider or representative who gains access to the information in this warrant shall not disclose the existence of the warrant, order, or investigation to any third party unless ordered to do so by the Court. Additionally, the agency requests that all court orders and supporting documents, including the affidavit and search warrant, be sealed until further order by the Court.

e.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

29